IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLOTTE HUTCHINSON, | ) | Case No. 1:16-cv-0038 |
| o.b.o. T.H., a minor, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | | |

## I.      Introduction

Plaintiff, Charlotte Hutchinson ("Plaintiff"), on behalf of her minor grandson, T.H.,

seeks judicial review of the final decision of the Commissioner of Social Security denying her

application for supplemental security income under Title XVI of the Social Security Act.  This

matter is before the court pursuant to 42 U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the

Commissioner be VACATED and REMANDED.

## II.      Procedural History

On November 5, 2012, plaintiff filed an application for Supplemental Security Income

("SSI") on behalf of her grandson, alleging disability beginning on January 1, 2009, when he was

five years old. (Tr. 144-145)  Plaintiff alleged that T.H was disabled with the following

impairment:  ADHD, anger issues, depression, PTSD, acting out, fighting in school, behind in

reading. (Tr. 147) Plaintiff's application was denied initially on January 29, 2013 (Tr. 74-81) and after reconsideration on April 5, 2013. (Tr. 83-91) On April 17, 2013, plaintiff's counsel requested an administrative hearing. (Tr. 114)

The administrative hearing took place before Administrative Law Judge Frederick Andreas ("ALJ") on July 24, 2014. (Tr. 35) On December 2, 2014, the ALJ issued a decision finding that T.H. was not disabled. (Tr. 13-26) On November 30, 2015, the Appeals Council denied review, rendering the ALJ's December 2, 2014 decision the final decision of the Commissioner. (Tr. 1-3)

On January 8, 2016, Plaintiff filed an appeal of the ALJ's final decision. (Doc. 1) Defendant answered and filed the transcript of the administrative proceedings on March 14, 2016. (Docs. 10 and 11) Plaintiff filed her brief on the merits on May 9, 2016 (Doc. 14); Defendant filed her brief on the merits on July 8, 2016 (Doc. 18); and plaintiff filed a reply on July 19, 2016 making the matter ripe for this court's review.

## III. Evidence

### A. Personal Evidence

T.H. was born on June 10, 2003, and was eleven years old on July 24, 2014, the date of his hearing. He was living with his grandmother, Ms. Hutchinson, and his twelve year old sister. (Tr. 50) T.H. was going to be entering the fifth grade at Warrensville Junior High in the Fall of 2014, after completing summer school. (Tr. 56)

### B. Medical Evidence and Educational Information

#### 1. Medical Evidence

On February 25, 2010, T.H. presented to Dr. Sylvester Smarty for a psychiatric evaluation due to a history of inattention, hyperactivity and impulsivity. (Tr. 268) Ms.

Hutchinson reported that T.H. had been born full term in June 2003, but that he tested positive for cocaine at birth. (Tr. 267)  T.H. was placed in foster care for nine months before being placed with his grandmother. (Tr. 267)  Dr. Smarty noted that Ms. Hutchinson adopted T.H. in 2009. (Tr. 267)  At the time of the evaluation, T.H. was hyperactive, was having a hard time sleeping at night, was having problems focusing in school.  (Tr. 269)  Dr. Smarty diagnosed ADHD, combined, and mood disorder. (Tr. 268)  He prescribed Methylphenidate and Melatonin.  (Tr. 269)

At an appointment on March 10, 2011, Dr. Smarty noted that T.H. was not doing well. (Tr. 264)  He had not been sleeping well and was stealing and lying. (Tr. 264)  Dr. Smarty prescribed Adderall and Risperdal. (Tr. 265)  In December 2011, Ms. Hutchinson reported that T.H. was doing well in school.  (Tr. 256)  However, he had poured out his liquid Risperdal and replaced it with water because he did not want to sleep at night. (Tr. 256)  In February 2012, Ms. Hutchinson reported that T.H. was not doing well at school.  (Tr. 252)

Ms. Hutchinson discontinued T.H.'s medications during the summer of 2012.  (Tr. 250)  He started taking his medications again in the fall of 2012.  (Tr. 250)

In November 2012, T.H. told his grandmother that his older brother had sexually abused him. (Tr. 248)  When Dr. Smarty interviewed him, T.H. told him that his older brother had been doing "nasty stuff" to him and that he was not sleeping well at night. (Tr. 248)  The medical record indicates that the molestation involved both oral and anal sex and that it had been occurring "for a long time now."  (Tr. 248)  T.H. was depressed all the time and doing poorly in school. (Tr. 248)  Dr. Smarty prescribed Zoloft to help with anxiety and depressive symptoms. (Tr. 250)  Dr. Smarty also referred T.H. for counseling because he "urgently needs it to help

cope with the traumatic experience he has been through." (Tr. 249)  The medical record reflects that T.H. and his grandmother attended a number of counseling sessions in 2013.

In December 2012, Ms. Hutchinson indicated that T.H.'s older brother was sent to a juvenile detention setting. (Tr. 295)  Treatment notes state that T.H. was "not doing good" on some days. (Tr. 287)  Ms. Hutchinson reported that T.H. was frequently found to be staring into space and crying. (Tr. 287)  She also reported that he was getting into trouble occasionally at school and fighting with peers who teased him. (Tr. 293)  In December 2012, Dr. Smarty completed a questionnaire regarding T.H. (Tr. 270)  He opined that T.H. had ADHD, combined type, PTSD, and a mood disorder. (Tr. 270)   He noted that T.H. was taking Adderall XR, Adderall, Risperdel, and Zoloft. (Tr. 270)

In March and April 2013, T.H. reported seeing dead people and having flashbacks of what happened to him with his brother. (Tr. 281, 283)  Dr. Smarty modified T.H.'s medication and dosage in March 2013 "to further help with depression and PTSD symptoms."  (Tr. 282)  Dr. Smarty's notes show that T.H. was improving, but still struggling. (Tr. 284)

In June 2013, T.H. denied any audio or visual hallucinations, but his grandmother reported he was scared to sleep with the lights off.  (Tr. 302)  Dr. Smarty's notes from August 2013 indicate that T.H. was "doing good." (Tr. 300)  He was continuing to have a depressed mood at times but he was doing well with his ADHD symptoms and was not dreaming anymore. (Tr. 300)  He was continuing to have difficulty sleeping at night because his grandmother was not giving him his medication every night. (Tr. 300)

In September 2013, Dr. Smarty's notes indicate that T.H.'s medicine had been giving him headaches. (Tr. 298)  He was not taking Zoloft or his afternoon dose of Adderall.  (Tr. 298)  He

was doing better at school and his grades were "generally satisfactory" with mostly As and Bs. (Tr. 298)

In December 2013, Dr. Smarty's notes state that T.H. was not doing well. (Tr. 310) He had been disruptive in school, laughing inappropriately, writing on his body with an ink pen. (Tr. 310)  He was waking at night and his grades were going down. (Tr. 310)  Dr. Smarty recommended that he continue taking his medication and supportive therapy.  (Tr. 311)

In January 2014, T.H.'s grandmother reported that he was "coming along." (Tr. 308) He was sleeping better with "happy dreams" (Tr. 308)  However, she reported that he was still having bad days during which he would fight with other children. (Tr. 308)  On the other hand, she reported that he was getting out more and playing basketball.  (Tr. 308)

In April 2014, Dr. Smarty's notes indicate that T.H.'s grandmother took him off of his medications for a while. (Tr. 306)  She had stopped giving him Risperdal after seeing the risks on television. (Tr. 306)  However, she observed that his behavior changed when he was not taking medication. (Tr. 306)  He was acting timid, like he was afraid of everything. (Tr. 306) She also noticed that his school work worsened.  (Tr. 306)  Dr. Smarty recommended that T.H. stay on medication but changed the medication to Vynanse and modified the dosages. (Tr. 306)

### 2.    School Records

In December 2012, when T.H. was nine years old, his third grade teacher, Sandra Skandal, completed a teacher questionnaire using Social Security Administration form SSA-5565-BK. (Tr. 271-278) Ms. Skandal reported that T.H. had a very difficult time focusing and was off task when he did not take his medication.  (Tr. 273, 277)  Ms. Skandal also indicated that T.H. had a limited vocabulary and struggled with writing, being unable to write a complete sentence. (Tr. 272)  T.H. worked with a partner who was achieving at two levels higher. (Tr.

273)  Obvious problems were noted in the following areas: providing organized oral

explanations and adequate descriptions, expressing ideas in written forms, (Tr. 272) completing

work accurately without careless mistakes, working without distracting self or others, working at

reasonable pace/finishing on time, (Tr. 273) using appropriate language to the situation and

listener, using adequate vocabulary and grammar to express thoughts/ideas in general everyday

conversation, (Tr. 274) and knowing when to ask for help. (Tr. 276) Ms. Skandal noted that T.H.

had a hard time speaking in front of groups.  (Tr. 274)  Ms. Skandal also related that T.H.'s

speech could only be understood one-half of the time when the topic was known and very little

when the topic of conversation was unknown. (Tr. 275)  Ms. Skandal reported that it had not

been necessary to implement behavior modification strategies for T.H. (Tr. 274)

       In May 2014, T.H.'s fourth grade teacher, Angela Means, also provided responses to a

teacher questionnaire related to T.H.'s limitations, also using Social Security Administration

form SSA-5565-BK, as had been used by Ms. Skandal.  (Tr. 202-209)  Ms. Means reported that

T.H. had obvious problems with the following:  comprehending oral instructions, understanding

school and content vocabulary, understanding and participating in class discussions, providing

organized oral explanations and adequate descriptions, expressing ideas in written form, learning

new material, applying problem-solving skills in class discussions, (Tr. 203) paying attention

when spoken to directly, carrying out multi-step instructions, completing work accurately

without careless mistakes, working at reasonable pace/finishing on time, (Tr. 204) expressing

anger appropriately, (Tr. 205) being patient when necessary, responding appropriately to changes

in own mood, using appropriate coping skills to meet daily demands of school environment, and

knowing when to ask for help. (Tr. 207)  She also reported that T.H. had serious problems with

the following activities:  reading and comprehending written material, comprehending and doing

6

math problems, (Tr. 203) and working without distracting self or others. (Tr. 204)  Ms. Means indicated that she did not know whether T.H. took medication. (Tr. 208)  In completing the SSA form, Ms. Means filled in all of the blanks appropriate to her answers, but she provided no additional narrative information on the spaces provided.

T.H.'s most recent report card from fourth grade shows that T.H. had a mix of A's, B's and C's for his final grades. (Tr. 211)  However, he had also received several D's and one F on his fourth grade report card for different grading periods. (Tr. 211) A spring 2013 reading and math achievement assessment indicated that T.H. was proficient in reading but was performing at the limited level and was not meeting the standards for 4th grade math. (Tr. 215-216)

### C.    Opinion Evidence

#### 1.    Treating Psychiatrist - Dr. Sylvester Smarty – December 2012

In December 2012, Dr. Smarty completed a questionnaire regarding T.H. (Tr. 270)  He opined that T.H. had ADHD, combined type, PTSD, and a mood disorder. (Tr. 270)   He noted that T.H. was taking Adderall XR, Adderall, Risperdel, and Zoloft. (Tr. 270)  Dr. Smarty opined that T.H's psychiatric impairments affected his ability to acquire and use information.  (Tr. 270) He specifically noted that T.H's impairments led to "poor concentration, distractibility, low attention span, lack of motivation, and unwillingness to do school work.) (Tr. 270)  Dr. Smarty also opined that T.H.'s impairments affected his ability to interact and to relate to others.  He stated that T.H.'s impairments caused "social withdrawal, difficulty making new friends, and [reluctance] to share emotional reciprocity." (Tr. 270)  Dr. Smarty stated that T.H.'s impairments also affected his ability to attend to and complete tasks.  Dr. Smarty noted that T.H. was "easily distractible and needs repeated reminders and forgets easily."  (Tr. 270)  Finally, Dr. Smarty opined that T.H.'s impairments affected his ability to care for himself and keep himself safe.

7

The questionnaire completed by Dr. Smarty indicates that T.H. was "unable to do chores without continuous reminders, he acts impulsively without consideration of the consequences." (Tr. 270) In addition to the foregoing opinion form, Dr. Smarty's treatment notes are replete with his observations and professional conclusions from the times he treated T.H. from 2010 to 2014.

### 2.    State Agency Reviewer – Caroline Lewin, Ph.D. – January 2013

In January 2013, Dr. Caroline Lewin, Ph.D., a psychologist, reviewed T.H's medical record on behalf of the state agency.  (Tr. 78)  She opined that T.H. had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating to others. (Tr. 78)  She opined that T.H. had no limitation in the domains of moving about and manipulation of objects, caring for self and health and physical well-being. (Tr. 78)  Dr. Lewin indicates that she gave controlling weight to T.H's treating source. (Tr. 79)

### 3.    State Agency Reviewer – Dr. Bruce Goldsmith, Ph.D. – March 2013

In March 2013, Dr. Bruce Goldsmith, Ph.D., a psychologist, also reviewed T.H.'s record and offered an opinion similar to the opinion offered by Dr. Lewin. (Tr. 88)  However, rather than finding that T.H. had no limitation in caring for himself, Dr. Goldsmith opined that T.H. had a "less than marked" limitation in this domain. (Tr. 88)  Dr. Goldsmith also states that he had given controlling weight to T.H.'s treating source. (Tr. 89)

### D.    Testimonial Evidence

#### 1.    Plaintiff Charlotte Hutchinson's Testimony

Ms. Hutchinson is T.H.'s grandmother and has known him his entire life, but had custody of him for the past six years.  (Tr. 38)  In July 2014, when the hearing was held, T.H. was living

with Ms. Hutchinson and his twelve year old sister. (Tr. 50)  He was entering Fifth Grade at Warrensville Junior High after completing summer school in the summer. (Tr. 56)

When T.H. was born, he was placed in a foster home because his mother was on drugs. (Tr. 51) Ms. Hutchinson got custody of him when he was around one year old. (Tr. 52)  He stayed with her until he was about two and a half years old. (Tr. 52)  He then lived with his mother for some time until he was six or seven years old.  (Tr. 52)  He then returned to live with his grandmother. (Tr. 52)  She sought and was awarded custody of T.H. after he complained that his mother's boyfriend had held a gun to her head in front of T.H. (Tr. 53-54)  After moving back with Ms. Hutchinson, he started talking about seeing and hearing dead people. (Tr. 54)

A couple of years before the hearing, T.H. was molested by his older brother when Ms. Hutchinson was at the hospital having knee surgery.  (Tr. 54)  At the time of the administrative hearing, T.H.'s brother was 16 years old and living in a boys' home.  (Tr. 52)

Ms. Hutchinson testified that T.H. was regularly seeing a psychiatrist, Dr. Sylvester Smarty. (Tr. 54-55)  Ms. Hutchinson also stated that T.H.  was regularly seeing a counselor. (Tr. 55)

During his free time at home, T.H. did very little besides play video games. (Tr. 56)  He liked to play Ninja I, shooting and fighting. (Tr. 67)  Sometimes, Ms. Hutchinson would find T.H. just sitting and staring at the game, instead of playing it. (Tr. 57)  T.H. had previously played basketball, but stopped when his father said he wasn't playing well anymore. (Tr. 51)

T.H. didn't talk about or play with any friends. (Tr. 49)  He told his grandmother that certain boys were making fun of him or picking on him. (Tr. 60)   Ms. Hutchinson also stated that T.H. had gotten into fights and had previously been suspended. (Tr. 60)  Ms. Hutchinson reported that T.H. had recently "failed" his proficiency tests. (Tr. 61)

Ms. Hutchinson testified that T.H. was able to bathe himself but that she sometimes had to remind him. (Tr. 57-58) Ms. Hutchinson would not permit T.H. to go to the store by himself. (Tr. 58-59) He was not permitted to use the microwave on his own. (Tr. 58-59)

Ms. Hutchinson testified that T.H. did not like to take his medicine. (Tr. 58) He complained that the medicine was causing headaches. (Tr. 44) Ms. Hutchinson had stopped giving him his medicine for a couple of weeks. (Tr. 44) However, she noticed that he was not functioning as well without it. (Tr. 44) T.H.'s psychiatrist told Ms. Hutchinson that she should not have taken him off of the medication. (Tr. 45)

### 2. Testimony of T.H.

T.H. also testified at the hearing in July 2014. He testified that he did not have any friends at school or in the neighborhood. (Tr. 64, 66) He could not remember any of the kids' names in his group at school. (Tr. 64) He admitted that he had gotten into fights at school when other kids picked on him. (Tr. 65-66) Upon further questioning, T.H. indicated that he had three friends at school. (Tr. 67) He stated that he did not sit with them because they were troublemakers. (Tr. 70) He had very little social life outside of school (Tr. 70-71)

T.H. initially denied seeing dead people. (Tr. 66) However, when questioned by his attorney, he stated that he had seen shadows three or four times in the hallway. (Tr. 68-69) He also reported hearing footsteps. (Tr. 69-70)

### IV. Standard for Childhood Disability

The standard for evaluating a child's disability claim differs from that used for an adult. 42 U.S.C. § 1382c(a)(3)(C); *see also, Miller ex Rel. Devine v. Comm'r of Soc. Sec.,* 37 F. App'x 146, 147 (6th Cir. 2002). A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be

expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations provide a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. 20 C.F.R. § 416.924(a). 416.924(c). At step three, a disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. 20 C.F.R. § 416.924(a). 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment. *See* 20 C.F.R. Pt 404, Subpt. P, App.1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder," whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir., 2003); *M.G. v. Comm'r of Soc. Sec.,* 861 F.Supp.2d 846, 855 (E.D. Mich., 2012).

If a child's impairment(s) do not "meet" a listed impairment, the impairment(s) may still be medically or functionally equal to the medical criteria of a listed impairment. *See* 20 C.F.R. § 416.92a. In order to medically equal a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment. *Id., See also Walls v. Comm'r of Soc. Sec.,* 2009 WL 1741375 at *8 (S.D. Ohio 2009) ("To determine medical equivalence, the Commissioner compares the

11

symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment.")

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects: (5) caring for self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).  To receive SSI benefits, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning.  20 C.F.R. § 416.926a(e)(2)(i).  "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i).  "It is the equivalent of functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, of complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked." 20 C.F.R. § 416.926a(e)(3)(i).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3)(i).

12

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

## V.     The ALJ's Decision

The ALJ made the following findings in his December 2, 2014 decision:

1.  The claimant was born on June 10, 2003.  Therefore, he was a school-age child on November 7, 2012, the date the application was filed, and is currently a school-age child.  (Tr. 16)

2.  The claimant has not engaged in substantial gainful activity since November 7, 2012, the application date.  (Tr. 16)

3.  The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD; mood disorder, not otherwise specified; and posttraumatic stress disorder (PTSD).  (Tr. 16)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 16)

5.  The claimant does not have an impairment or combination of impairments that functionally equal the severity of the listings. (Tr. 16)

6.  The claimant has not been disabled, as defined in the Social Security Act, since November 7, 2012, the date the application was filed. (Tr. 25)

In determining functional equivalence, the ALJ individual evaluated claimant's abilities under all six domains of functioning and made the following findings:

1.  The claimant had less than marked limitation in acquiring and using information. (Tr. 21)

2.  The claimant had less than marked limitation in attending and completing tasks. (Tr. 22)

13

3. The claimant had less than marked limitation in interacting and relating with others. (Tr. 23)

4. The claimant had no limitation in moving about and manipulating objects. (Tr. 24)

5. The claimant had less than marked limitation in the ability to care for himself. (Tr. 24)

6. The claimant had no limitation in health and physical well-being. (Tr. 25)

Based on the foregoing the ALJ determined that claimant had not been under a disability since November 7, 2012, the date the application was filed.  (Tr. 25)

## VI.  Parties' Arguments

Plaintiff's brief on the merits (Doc. 14) argues that the ALJ erred in finding that T.H. did not have marked impairments in at least two of the domains of functioning. Plaintiff also argues that the ALJ did not appropriately weigh the expert opinions or Ms. Hutchinson's credibility.

Defendant filed a brief on July 8, 2016.  (Doc. 18)  Defendant argues that the ALJ properly found that medication helped control T.H.'s underlying mental condition.  Defendant also argues that the ALJ properly weighed the expert opinions and that his determination was supported by substantial evidence.

The undersigned has reviewed the record, including those specific portions cited by the parties, considered the parties' arguments, and applied the applicable legal standards.  Based upon that analysis, a recommendation to VACATE the decision of the Commissioner and to REMAND the matter for further proceedings is set forth below.

## VII.   Law & Analysis

### A.   Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

15

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.      Treating Physician Rule

Plaintiff argues that the ALJ improperly placed little weight on the opinion of T.H.'s treating psychiatrist, Dr. Smarty, and failed to articulate good reasons for deciding not to assign controlling weight to that opinion. The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661

F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The so-called treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not necessarily required to explain in detail how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.").  "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers,* 486 F.3d at 243.  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> [T]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis."  See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Plaintiff's treating psychiatrist, Dr. Sylvester Smarty, completed a form in December 2012 regarding T.H.'s limitations. (Tr. 270)  Although Dr. Smarty did not specifically use the term "marked limitation" in describing the impact that T.H.'s impairments placed on his ability to function, Dr. Smarty's notes indicate that T.H.'s impairments had a significant impact on his ability to function.  As stated above, Dr. Smarty indicated that T.H.'s impairments led to poor

concentration, distractibility, low attention span, lack of motivation and unwillingness to do school work in the domain of acquiring and using information. (Tr. 270)  T.H.'s impairments caused social withdrawal, difficulty maintaining new friendships and reluctance to share emotional reciprocity in the domain of interacting and relating to others. (Tr. 270)  In the domain of attending and completing tasks, T.H.'s limitations affected his abilities because he was easily distracted, needed repeated reminders and forgot easily.  (Tr. 270)  Finally, Dr. Smarty opined that T.H.'s domain of taking care of himself would be affected because he was unable to do chores without continuous reminders and he acted impulsively without consideration of the consequences. (Tr. 270)

>  Regarding Dr. Smarty's opinion, the ALJ stated:
>
>  Dr. Smarty opined that claimant has limitations in the domains of acquiring and using information, interacting and relating with others, attending and completing tasks, and caring for himself.  He opined that claimant has poor concentration, distractibility, lack of motivation, social withdrawal and impulsivity.  The undersigned has considered Dr. Smarty's opinion and gives it little weight because subsequent progress notes indicate a higher level of functioning when claimant is taking his prescribed medications.  Dr. Smarty's progress notes are discussed in detail above.

>  Although the ALJ indicates that Dr. Smarty's notes are discussed "above," they are only

discussed in relation to specific records showing that T.H. had stopped or missed taking his medications.  The ALJ's decision offered no other discussion of Dr. Smarty's progress notes.

>  The ALJ has provided one reason for according only little weight to the opinion of Dr.

Smarty: that the child seemed to have improved, particularly when taking his prescribed medication between December 2012 when Dr. Smarty completed the opinion form and mid-2014, when Dr. Smarty last saw T.H. before the hearing.  The issue for the court's consideration is whether that reason is supported by or in conflict with the evidence in the record, and whether it is sufficiently specific.

19

The ALJ dids not explain which progress notes show that T.H. was displaying a higher level of functioning after Dr. Smarty completed the questionnaire in December 2012.  Although some of Dr. Smarty's 2013 and 2014 notes report that patient is "doing good" (Tr. 300) or that he is "doing much better in school," (Tr. 298)  other progress notes state that T.H. was "not doing well, has been disruptive in school, laughing inappropriately, writing on his body with ink pen …" (Tr. 310)  Moreover, these subsequent progress notes from December 2013 report a decline in T.H.'s functioning at a time when there was no report of any missed medications. (Tr. 310)

Defendant, perhaps aware of the weakness of the ALJ's analysis, points out that, even if the ALJ did not properly weigh Dr. Smarty's opinion, the plaintiff has, at most, "only identified harmless error." (Doc 18, p. 15)  Defendant argues that Dr. Smarty did not actually state that T.H. had marked or extreme limitations in any of the four domains in which he indicated that T.H.'s limitations would have an effect.  Importantly, only defendant made this argument; the ALJ did not support the weight given to Dr. Smarty on that basis.

20 C.F.R. §404.1527(c)(2) sets forth the standards for weighing opinions from treating sources:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

Subsection (c)(2)(i) provides, in part:

When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

Subsection (c)(2)(ii) provides, in part

Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.

The ALJ accorded greater weight to the opinions from two nontreating sources than to the opinion of Dr. Smarty. The ALJ did not discuss the details of Dr. Smarty's interactions with plaintiff – although the record shows that Dr. Smarty had treated T.H. for over four years.  The ALJ did not even specify which of Dr. Smarty's subsequent progress notes showed that T.H. was functioning at a higher level.

It is apparent that the ALJ was greatly troubled by the reports that T.H.'s grandmother, Ms. Hutchinson, intermittently failed to give T.H. the medication Dr. Smarty had prescribed. The ALJ attempted to correlate the reports of T.H.'s improvements with the times the medication regimen was followed, and also the reports of T.H.'s downturns with the times when the child was not given his medication on schedule.  The problem with this approach is that it turns the ALJ into a medical expert who would discount the opinions of Dr. Smarty without ever concluding that a single thing actually stated by Dr. Smarty was unfounded.

In contrast, the ALJ gave "great weight" to consultative reviewers, Dr. Lewin and Dr. Goldsmith, who, having only reviewed T.H.'s records, concluded that he had no marked limitations in any of the functional domains. The ALJ stated:

As for the opinion evidence, the assessments of the State Agency psychological consultants have been considered in determining the child's functional limitations. The undersigned has given great weight to the State Agency psychological

consultants' opinions regarding the six domains of functioning.  Although neither examining nor treating health providers, these experts are licensed pscyhologists with knowledge of the Social Security Administration's program and requirements for evaluating mental impairments and resulting limitations.  These opinions are derived from and consistent with the school and overall evidence and are not credibility contradicted by any treating source.  Moreover, the evidence received into the record after these determinations did not provide any credible or objectively supported new and material information that would alter the State Agency findings concerning these areas.

(Tr. 19)

Dr. Smarty had more of a longitudinal perspective than either Dr. Lewin or Dr. Goldsmith who only reviewed plaintiff's records.  The undersigned further notes that the ALJ denied plaintiff's request for a medical expert stating that he "didn't see any conflicts" in the evidence.[1] (Tr. 40)  After so concluding, however, the ALJ evidently did find contradictions between the reviewing physicians and the treating source, because he accepted the reviewers and assigned little weight to the treating source, ostensibly because their respective conclusions did not agree.   The ALJ did not provide a sufficient explanation for why greater weight was accorded to the consultants than to the treating source.

Finally, because of the way the ALJ wrote about his decision to discount the weight to be given to Dr. Smarty's opinion, there is no way to know whether the ALJ considered the elements required by 20 C.F.R. § 416.927(c)(2)-(6).  Although he concluded that Dr. Smarty's opinion was inconsistent with subsequent progress notes, there was no discussion of the length of

---

[1] Social Security Ruling 96-5p states the circumstances under which an ALJ must re-contact a claimant's treating source. SSR 96-5p, 1996 SSR LEXIS 2, 1996 WL 374183, at *6 (1996). Two conditions must be met. First, the evidence must not support the treating source's opinion. Second, the ALJ must be unable to ascertain the basis of the physician's opinion from the record. *Id.; Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 (6th Cir. 2010) ("An ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where [] the ALJ rejects the limitations recommended by that physician.") (quoting *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156, n. 3 (6th Cir. 2009)).  Here, the ALJ never rejected the limitations expressed by the treating source; he simply concluded that those opinions were outdated.  Although the ALJ may not have been required to re-contact Dr. Smarty for an updated opinion, he was required but failed to provide an adequate explanation for the weight given to Dr. Smarty's opinion.

treatment provided by Dr. Smarty, the supportability of Dr. Smarty's opinion at the time it was formed, his specialization as a psychiatrist, or any other relevant factors. *Rogers,*486 F.3d at 242. The ALJ did not show any deference to Dr. Smarty's opinion and his apparent failure to comply with the agency's rules warrants a remand unless it was harmless error. See *Wilson,*F.3d at 545-546.

The purpose of the "good reasons" requirement is two-fold.  First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied."  *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error."  These circumstances are present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation.  "*Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir.

2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. Appx. at 551.

Here, the reason given by the ALJ to support discounting the opinion of plaintiff's treating physician was questionable at best.  Moreover, there is no way to know whether he considered the factors required by 20 C.F.R. § 416.927(c)(2)-(6) including the supportability of Dr. Smarty's opinion.   For these reasons, the undersigned concludes that the court should find that the ALJ's failure to provide sufficiently specific "good reasons" for discounting Dr. Smarty's opinion as to the impairments of T.H. was not harmless error.  Even if there were good reasons to reject Dr. Smarty's opinion, the ALJ failed to articulate those reasons with sufficient specificity so as to allow for meaningful review.  Accordingly, the court should reject the ALJ's determination.

### C.     ALJ's Analysis Regarding Domains of Functioning

Plaintiff also argued that the ALJ erred in his analysis of whether T.H.'s impairment functionally equaled the Listings by failing to properly consider some of T.H.'s functional domains.  As stated above, a child is considered to functionally equal the disability Listings when he has a marked limitation in at least two out of six "domains" of functioning, or an extreme limitation in just one.  20 C.F.R. § 416,926a(a); *Elam ex rel Golay v. Comm'r,* 348 F.3d 124, 127 (6th Cir. 2003).  The ALJ found that T.H. did not have a marked limitation in any of the six domains.  Plaintiff argues that the ALJ should have found that T.H. had a marked limitation

in at least two of the following domains: acquiring and using information, attending and completing tasks, interacting and relating with others or caring for himself.[2] (Doc. 14)

### 1.    Acquiring and Using Information

When evaluating the domain of acquiring and using information, an ALJ must consider how well a child acquires or learns information, and how well he uses the information he has learned.  20 C.F.R. § 416.926a(g).  The ALJ found that T.H. had less than a marked limitation in this domain for the following reasons:

> The State agency psychological consultants opined that claimant had less than marked limitation in this domain.  This is consistent with claimant's school records.  The claimant's most recent report card shows that he is receiving As, Bs and Cs.  He is not in any special education classes and does not have an Individualized Education Plan.  The record shows 18 absences in the last school year but he was still able to maintain satisfactory grades.  Claimant's most recent reading and math achievement assessments show that his reading is at grade level but his math skills are at the "limited level."  Claimant's third grade teacher, Ms. Skandal, noted that he only has an "obvious problem" in providing organized oral explanations and adequate descriptions and expressing ideas in written form. However, claimant's most recent reading assessment indicates that he is reading at grade level.

Plaintiff argues that the ALJ disregarded the fact that T.H.'s fourth grade teacher and guidance counselor had subsequently reported a deterioration in his functioning at school and T.H. was found to perform at the limited level in math and was barely proficient in reading.

Although the ALJ's decision regarding T.H.'s limitations in the domain of acquiring and using information may be supported by substantial evidence, he improperly weighed the expert opinions.  As stated above, the ALJ gave great weight to the state agency consultants and assigned little weight to the opinion of T.H.'s treating psychiatrist, Dr. Smarty.  In doing so, the ALJ failed to account for the fact that the state agency consultants themselves gave "controlling

---

[2] Plaintiff implicitly concedes that T.H. does not have a marked limitation in the domains of moving about and manipulating objects and health and physical well-being.

weight" to the opinions of Dr. Smarty.  The undersigned is recommending a remand of this case because of the improper weighing of the medical opinions.  The proper assignment of weight to the opinion of Dr. Smarty and/or a proper explanation of the weight assigned may impact the ALJ's finding as to T.H's ability to acquire and use information. *See Sharp v. Comm'r of Soc. Sec.,* 2015 U.S. Dist. LEXIS 72718, *22-23 (S.D. Ohio June 4, 2015).

### 2.    Attending and Completing Tasks

In the domain of attending and completing tasks, an ALJ considers how well a child is able to focus and maintain attention and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities. 20 C.F.R. § 416.926a(h).  The ALJ determined that T.H. had a less than marked limitation in this domain for the following reasons:

> The State agency psychological consultants opined that claimant has less than marked limitation in this domain.  This is consistent with the objective evidence and inconsistent with Ms. Hutchinson's allegations on the function report.  The record does show some limitation in this domain but not to the level of severity alleged by Ms. Hutchinson.  Ms. Skandal noted that claimant has an "obvious problem" in the areas of completing work accurately, without careless mistakes; working without distracting self or others, and working at reasonable pace/finishing on time.  However, Ms. Skandal noted that claimant struggles "more intensely" only when he does not take his medications.  In addition, the medical record as discussed above shows that claimant's ADHD is under good control when he takes his medication.

Plaintiff argues that the ALJ relied again on the state agency reviewers and the report from Ms. Skandal.  Plaintiff contends that the ALJ erred in failing to consider the subsequent report from T.H.'s fourth grade teacher and the function report.  Plaintiff argues that the function report was consistent with the information provided by both of plaintiff's teachers and that it should have been considered when the ALJ considered the domain of attending and completing tasks.

26

The court finds troubling the ALJ's handling of the report of the fourth-grade teacher, Ms. Means.  Discounting her opinions because she merely filled out a checklist form, the ALJ failed to mention that the checklist about which he was critical was prescribed by the Social Security Administration itself.  While it is true that Ms. Means did not take advantage of the opportunity to supply supporting narrative for her opinions, it is also true that nothing on the SSA form alerted her to the risk that her opinions would ignored if she failed to take that extra step.  The court concludes that opinions expressed on an SSA-supplied checklist form by someone who was with the child from 8:45 a.m. to 4:00 p.m. five days a week should not ignored absent some indication that the person's observations were inconsistent with the overall medical and educational record.

The court finds merit in plaintiff's argument that Ms. Means' opinions reflect the deterioration of T.H.'s status during the 2013-2014 school-year, prior to the hearing.  This is not surprising when one considers the additional information found Dr. Smarty's records that just a few months earlier T.H. began to express fear that the older brother who had raped him may have returned to Ms. Hutchinson's home.  (Tr. 302, 304)  The undersigned concludes that the re-evaluation of functional domains at issue must include not only a proper weighing of the medical expert opinion but also must include the information provided by the fourth-grade teacher, Ms. Means.

As with the discussion related to the domain of acquiring and using information, the ALJ's decision improperly weighed the expert opinions and did not provide good reasons for doing so.  It is difficult to determine what impact that may have had on his finding related to attending and completing tasks.  *See Sharp v. Comm'r of Soc. Sec.,* 2015 U.S. Dist. LEXIS 72718, *22-23 (S.D. Ohio June 4, 2015).  The undersigned has recommended that the case be

remanded for a proper explanation of the weight assigned to the opinion of Dr. Smarty and/or a

proper explanation of the weight assigned.  This evaluation may also impact the ALJ's finding as

to T.H's ability to attend and complete tasks.

### 3.      Interacting and Relating with Others

In evaluating the domain of interacting and relating with others, the ALJ considers how

well the claimant initiates and sustains emotional connections with others, develops and uses the

language of his community, cooperates with others, complies with rules, responds to criticism,

and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i).  The ALJ based

his decision that T.H. had a less than marked limitation in this domain on the following:

> The State agency consultants opined that claimant had less than marked limitation
> in this domain.  This is consistent with the objective evidence and school records.
> Ms. Skandal noted that claimant has a "hard time" speaking in front of groups and
> he has a "very limited vocabulary."  Ms. Hutchinson testified that claimant does
> not have any friends but this is contrary to claimant's testimony.  Claimant
> testified that he does have one friend at school.  He testified that he sits with a
> group of kids during lunch.  However, claimant did testify that he has gotten into
> fights with other children.  The medical record indicates that claimant feels
> depressed due to sexual abuse by his brother but it appears that his symptoms are
> under adequate control with medications.

Plaintiff argues that the ALJ disregarded standards set forth in Social Security Ruling 09-

5p, which requires the consideration of whether the child develops more lasting friendships,

increasingly understands how to work in groups, increasingly understands another's point of

view and tolerates differences, attaches to adults other than parents, and shares ideas.  Plaintiff

contends that the ALJ disregarded Ms. Mean's report, misconstrued T.H.'s testimony regarding

his "friends" and incorrectly concluded that T.H.'s symptoms were under control with

medication.

Regarding this domain, the ALJ's conclusion is questionable.  Many of the facts listed by

the ALJ do not support his finding.  The ALJ stated that T.H. has a limited vocabulary, does not

like to speak in front of groups, has gotten into fights, and feels depressed about his history of sexual abuse. These facts weigh against the ALJ's finding that T.H. had a less than marked limitation in the domain of interacting and relating to others.

In support of his finding, The ALJ stated that T.H. has one friend at school and sits with a group of kids during lunch. (Tr. 23) These facts are not supported by the record. T.H. testified that he had three friends. (Tr. 67) However, he later stated that he talked to them at school, but wouldn't sit with them at lunch because they were troublemakers. (Tr. 70) In fact, when the ALJ asked if T.H. sat with anyone when he ate his lunch, his response was "not really." (Tr. 64) Thus, the facts stated in support of the ALJ's findings are not borne out by the evidence in the record; and some of the facts he cited simply do not support his finding. The undersigned finds that the ALJ's finding as to the domain of interacting and relating with others is not properly supported by substantial evidence and recommends that this case be remanded for the ALJ to reconsider and properly articulate support – if it exists – for his finding related to this domain.

### 4. Caring for Yourself

In considering the domain of caring for yourself, an ALJ considers how well the claimant maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). In deciding that T.H. had a less than marked limitation in this domain, the ALJ again relied on the state agency psychological consultants. He also stated:

> The record shoes some limitations in this domain. In regards to his ability to care for himself, Ms. Hutchinson testified that claimant is able to bathe himself with reminders. She testified that he does not take his medications on his own and complains that his stomach hurts. She testified that claimant has been suspended from school three times. She testified that claimant "probably can" use a

microwave but she does not let him because he almost caused a fire the last time
he used it.  Ms. Skandal noted that claimant does not ask for help.

Plaintiff argues that the ALJ again improperly disregarded the form completed by Ms.
Means, which described a child who has not learned how to control his moods or use appropriate
coping skills.

As with the domain of interacting and relating to others, the reasons stated in support of
the ALJ's conclusion that there was a less than marked limitation in the domain of caring for self
do not support his finding.  All but one of the reasons listed weigh against his finding.  The ALJ
noted that T.H. could bathe himself but then stated that he won't take his medications, has been
suspended from school, isn't allowed to use the microwave because he caused a fire, and does
not ask for help.  It is hard to understand how these facts support the ALJ's finding that T.H. has
a less than marked limitation in the domain of caring for self.  The undersigned finds that the
ALJ's finding as to the domain of caring for self is not properly supported by substantial
evidence and recommends that this case be remanded for the ALJ to reconsider and properly
articulate the support – if it exists – for  his finding related to this domain.

### D.    Credibility of Ms. Hutchinson

Plaintiff also argues that the ALJ failed to properly evaluate the credibility of Ms.
Hutchinson.  (Doc 14, p. 18)  It is for the ALJ, and not the reviewing court, to evaluate the
credibility of witnesses, including that of the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d
525, 531 (6th  Cir. 1997); *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of
Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981).  However, the ALJ is not free to
make credibility determinations based solely upon an "intangible or intuitive notion about an
individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4.  Rather, such
determinations must find support in the record.  Whenever a claimant's complaints regarding

30

symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007).  The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.  *Id.*

Social Security Ruling 96-7p also requires that the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*  In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id.*

In his decision, the ALJ indicates that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons stated below."  The ALJ then indicates that Ms. Hutchinson had stopped giving T.H. his medications on several different occasions, rather than the one time, for two weeks, which she admitted during the hearing. (Tr. 18-19)  He points out that T.H. has only seen a therapist on a few occasions, not every two weeks as Ms. Hutchinson represented. (Tr.19)

31

The undersigned finds that the ALJ has provided a sufficiently specific explanation as to his assessment of Ms. Hutchinson's credibility and that the ALJ's credibility determination is supported by the record.  Accordingly, the undersigned would not recommend that the case be remanded on that basis.  However, because the undersigned has already recommended a remand of this matter, it is unnecessary for the court to further consider plaintiff's argument related to the credibility of Ms. Hutchinson.

## VIII.  Conclusion

For the foregoing reasons, it is recommended that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.

Dated: November 21, 2016

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**